IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,    )<br>                                                            )<br>              Plaintiff,           )<br>                                                            )           **8:07CR124**<br>     vs.                                                )<br>                                                            )           **REPORT AND**<br>RENE RAMIREZ,                       )           **RECOMMENDATION**<br>                                                            )<br>              Defendant.        )  | |

This matter is before the court on the defendant's Motion to Suppress Evidence (#15). Hearing on the motion was held on June 8, 2007 and the transcript (#27) was filed June 14, 2007. The briefing schedule expired on July 5, 2007, at which time the motion was deemed submitted.

Defendant's semi truck tractor/trailer was stopped by a Nebraska State Trooper on February 19, 2007 for a license plate display violation. The officer searched the vehicle and found boxes of marijuana which led to the current indictment.

Defendant contends the fruits of the search should be suppressed because his vehicle was stopped without probable cause or reasonable suspicion of criminal activity, he was unlawfully detained after the traffic stop, and his vehicle was unlawfully searched, all in violation of his rights under the Fourth Amendment to the United States Constitution.

The government argues that the officer had probable cause to stop the vehicle for a traffic violation and defendant consented to the search of the truck.

For the reasons discussed below, I find that the defendant voluntarily consented to the search and recommend that the motion be denied.

## FACTUAL BACKGROUND

Nebraska State Trooper Chris Bigsby testified that he has been with the Nebraska State Patrol (NSP) for almost 18 years. For nearly all of that time, he has been assigned to the traffic division. His duties are enforcing the statutes of the State of Nebraska, traffic control, investigating accidents and other criminal activity he may encounter, and any other assignments he receives through the dispatcher. He conducts interdiction work, i.e., taking intervention action to intercept drugs, drug contraband and other contraband such as stolen property. He generally patrols in uniform using a marked cruiser on Interstate 80 between the Platte River and Lincoln, Nebraska, although he is sometimes assigned to other locations in a wider area surrounding Lincoln. He makes contact with semi-truck drivers two to three times each day he is on patrol.

Trooper Bigsby attended the NSP Training Academy, graduating in February 1990. During that time, he attended a 40-hour class dealing with drugs, drug identification, drug concealment, and investigation techniques. Between 1998 and 2001, he received ongoing training, including four classes offered through Desert Snow, Phases I-IV, in which he received instruction on concealment techniques, drug identification, courtroom testimony, and follow-up investigation with respect to different types of vehicles. Phase IV specifically

dealt with semis, and the participants were given hands-on training on locating aftermarket compartments in large semis.

Bigsby has also attended the DIAP-EPIC Conference, sponsored by the U.S. Department of Transportation, four times within the last six to eight years. During these conferences, he received instruction on criminal trafficking "trends," and current interdiction techniques for commercial motor vehicles. During these training sessions, Trooper Bigsby received instruction on how loads are placed into semi-trucks.

On February 19, 2007, Bigsby was working a 10-hour day shift, starting at 6 a.m. and ending at 4 p.m. He was in uniform, driving a marked patrol unit. The weather was clear and somewhat cold. There was snow on the ground, but it was not snowing.

At about 12:22 p.m., Trooper Bigsby pulled into the driveway to the truck parking area at the Flying J truck stop at Exit 432 near Gretna, Sarpy County, Nebraska. Shortly after he entered the parking lot, Bigsby saw the defendant, Rene Ramirez, driving a semi towards the same driveway to exit the Flying J; Bigsby was coming in, defendant was going out. Defendant's truck had a California license plate. As the truck passed by Bigsby's patrol car, Bigsby noticed that he could not read the license plate on the rear of the trailer because it was covered up or obscured.

The California license plate was of some significance to Bigsby. State Troopers Frey and Frazie had conducted a traffic stop of a vehicle at mile marker 415 on eastbound I-80, near the Lancaster/Cass County line. That stop involved two individuals from California,

and there were indicators that they might be traveling with another vehicle. Bigsby went to the Flying J to investigate that possibility.

Once Bigsby observed the obstructed license plate, he activated his camera and lights, turned around, and tried to catch up to the semi before it got onto the interstate, as it was safer to make the stop at that location. The videotape of the stop was received as Exhibit 1. Trooper Bigsby testified on cross-examination that he could not stop the truck just because it was a California-plated vehicle; he stopped it for the plate violation only. (64:1-5). The vehicle pulled over without incident on State Highway 31, in front of the Flying J, just south of the Interstate. The truck was facing north and parked on the paved shoulder of Highway 31. Bigsby parked right behind the defendant's truck.

Trooper Bigsby then approached the driver's side of the cab and contacted the defendant. There were no other people in the truck. He advised the defendant of the reason for the stop; requested his driver's license, registration, log book, and paperwork; and requested that the defendant come back and have a seat on the passenger side of the patrol car. Bigsby spoke to the defendant in English.

Defendant came back to the patrol car without incident and gave Bigsby the paperwork he requested. Bigsby noted that the name "Terry" was displayed on the driver's side door of the tractor; however, the defendant's name was not Terry. The truck also had a high DOT number with the number "01" on the front of the truck, indicating that the truck belonged to a new company that owned a single truck. (68:2-16). The defendant told Bigsby

that he did not know who or what "Terry" was. (68:22). In response to Bigsby's question, defendant said he had started his own company in June 2006. (75:6-13).

Before they got into the patrol vehicle, Bigsby showed defendant the license plate, explaining that he stopped the defendant's truck because he could not read the license plate.

Trooper Bigsby testified that the defendant's license plate was wrapped in plastic wrap, which covered the numbers and the name of the state. The plastic wrap was primarily on the top left portion of the plate, with more plastic wrap on a diagonal on the right side. (26:8-13). Bigsby believed a "clear visible plate violation" had occurred because all the numbers and lettering on a license plate must be clearly visible at all times. (26:14-18). Exhibit 3 is a photograph of the license plate as it appeared at the time of the traffic stop. (27:3-22).

After showing defendant the license plate, Bigsby and the defendant got into the patrol car. Bigsby began filling out the paperwork for the plate violation and ran the defendant's name through the Lincoln dispatch. The dispatcher advised there were no wants or warrants at all on the defendant's license.

While in the patrol car, Bigsby conversed with the defendant. They talked about defendant's travels, his log book, his paperwork, and how his load was in the vehicle. Defendant stated he was going from Chino, California to Pennsylvania; however, his paperwork showed that he was supposed to be going to an area in Virginia and then to Pennsylvania. Bigsby testified that he did not specifically ask the defendant about going to

Virginia. Instead, he pulled out a map and said, "where are you going?" and the defendant pointed to a point in northern Pennsylvania. (71:20).

They talked about the defendant's route throughout the duration of the traffic stop. Defendant told Bigsby that he came through New Mexico and had been driving on Interstate 40. Defendant did not like driving on I-40 because of construction. Defendant also commented that he did not like Denver. Bigsby noted that a truck driver probably would not like Denver at that time of year because there was a lot of snow. To Bigsby, there would be an advantage to driving on I-40 in that there was no ice or snow; he did not believe that construction work on I-40 would prevent defendant "from furthering his travels faster" through that area. (30:3-16). Bigsby acknowledged on cross-examination that he had not driven on I-40 for a really long time (78:10), and it would be "logical" to take I-80 as a route to Pennsylvania from the west coast. (79:25-80:3).

Bigsby asked the defendant if everything in his load was on pallets; if it was on pallets, the truck was probably loaded by a machine or forklift. If the load was on the floor, there was a probability the truck was loaded by hand. Defendant told Bigsby that the load was not on pallets. (31:5-7). Defendant initially told Bigsby that he had not inspected his load. If that were true, Bigsby wondered how the defendant knew whether the load was on pallets. He asked defendant again if he had inspected his load, and the defendant said yes, he had.

Bigsby testified that he focused the conversation more on the transportation, i.e., where the defendant was going. Each time, the defendant said he was just going to Pennsylvania and somebody else was taking the load from Pennsylvania to Virginia.

Meanwhile, Bigsby received the information he requested from the dispatcher. He decided to give the defendant a fix-it ticket instead of a citation. (32:21-25). Bigsby proceeded to complete the ticket and confirm that all the defendant's paperwork had been returned to him. Defendant then began to exit the patrol car by opening the passenger side door some time before Bigsby gave him the ticket or told the defendant he was free to leave. (33:18-19).

Trooper Bigsby testified he had called for assistance from NSP Investigator Richard Lutter before he got to the Flying J. He had asked whether Lutter wanted to come out to the Flying J and do some truck stop interdiction, in light of the earlier traffic stop made by Trooper Frey. (34:20-23). Lutter works with the commercial interdiction unit located in Omaha, and Bigsby thought Lutter or another officer might have a dog with them. The State Patrol office advised Bigsby that Lutter was already en route to the Flying J while Bigsby was talking to the defendant in the patrol vehicle. (36:4-11; 106:2-18).

Lutter and NSP Investigator Scott Haugaard arrived at the Flying J and parked their unmarked unit behind Bigsby's patrol unit. (37:1-8). Bigsby wanted them to check the rest of the parking lot area while he talked to the defendant. (37:15-24). Lutter and Haugaard drove over towards the Flying J. Meanwhile, Bigsby continued his conversation with the

defendant about the vehicle defect. They remained in Bigsby's patrol car, and Bigsby had not yet returned defendant's paperwork to him. (38:1-15).

Bigsby then overheard Lutter and Haugaard run a plate through the dispatcher. The incident was significant to Bigsby, because it was the plate on the vehicle stopped by Troopers Frey and Frazie at mile marker 415. The vehicle was now at the gas pumps. (38:16-25). The vehicle previously stopped by Frey and Frazie had driven to the gas pumps at the Flying J; Lutter and Haugaard were running the plate on that vehicle. Bigsby did not ask them to look for that vehicle; they just happened to find it and ran the plate. (95:2-5). Lutter and Haugaard did advise Bigsby that there was nothing suspicious about the vehicle. (95:8).

Lutter and Haugaard once again parked behind Bigsby's patrol unit, shortly before Bigsby completed the warning/vehicle defect ticket with the defendant. Bigsby returned defendant's paperwork and gave him the vehicle defect ticket. (39:17-25). Bigsby advised the defendant that he was receiving a vehicle defect ticket for the clear visible plate violation. There would be no points or any penalties; he just needed to get the plastic taken off the plate, show it to any law enforcement officer within five days, have the officer sign off at the bottom, put a stamp on the back of his copy, and put it in the mail. (40:7-11). The defendant confirmed that he understood and signed the form. The defendant's operator's license and any other papers had already been returned to him. (40:15-24).

As the defendant opened the door to the patrol vehicle as if to exit, Bigsby asked if the defendant would mind answering a few more questions and mind shutting the door so Bigsby could talk to him. According to Bigsby, the defendant made some kind of affirmative response in English, agreeing to answer more questions and closing the passenger door of Bigsby's patrol unit. (41:13-42:9).

Trooper Bigsby admitted on cross-examination that he was aware that the defendant's first language was not English; however, there were very few instances in which the defendant "struggled" to answer Bigsby's questions. (69:14-70:1). The defendant had some, but very little, difficulty in speaking clear English. (72:20-22).

The defendant remained seated in the patrol vehicle. Bigsby once again asked him about the load. (85:1-18). Defendant confirmed that he was going to Pennsylvania and that the load was on the floor of the truck, not on pallets. About 30 minutes into the stop (64:18-25), Bigsby activated the audio microphone located on his belt after he realized it was not turned on.[1] Bigsby testified that his patrol unit is set up so that when he activates his overhead lights on, his camera also comes on. The audio does not automatically come on; he has to manually activate the audio equipment, which is located on his belt. There is a light inside the patrol vehicle that indicates whether the audio equipment has been activated. (43:4-25).

---

[1] The videotape (Exhibit 1) indicates that defendant's vehicle was stopped at 12:33:08 and the audio function was activated at 12:59:55 when Bigsby sought permission to enter the trailer.

Bigsby thanked the defendant for agreeing to continue their conversation. Bigsby asked defendant to remain seated while Bigsby went back and talked to Investigators Haugaard and Lutter. The defendant agreed to do so. (44:4-18).

Bigsby then got out of his patrol vehicle and spoke with Haugaard and Lutter. He told them about the load being on the floor, among other things. He then returned to his patrol unit and asked the defendant if he could look at the load inside the trailer. According to Bigsby, the defendant gave him permission to do so. (45:18-25).

Bigsby testified that the defendant allowed him to break the seal on the trailer. Defendant and Bigsby both exited the patrol car, approached defendant's trailer, and Bigsby broke the seal using the collapsible baton on his utility belt. The seal was intact and it did not appear that the seal had been tampered with. (87:3-25). The defendant opened the right-hand side door. The inside of the trailer was dark. (104:21). Bigsby noticed there were stacks of shrink-wrapped boxes on the floor. Bigsby requested permission to get up and look. Defendant said he could do so. Shortly after entering the trailer, Bigsby asked for permission to stand on a stack of boxes, so he could get a better view, as the boxes were stacked above eye level. (46:6-47:6). After asking about three or four times, Bigsby "finally got a definitive answer." (47:18-19; 48:14-49:2). It appeared that defendant was worried about Bigsby crushing the boxes. Bigsby asked several times in order to clarify the defendant's answer. (48:1-7). Having been given permission, Bigsby stood on top of a half stack of boxes and told Investigator Haugaard what he was seeing. (49:13-24).

-10-

Bigsby called Trooper Frey on his cell phone, advising Frey about the boxes Bigsby observed in the trailer. (101:1-5). Frey told Bigsby that the load had some legitimate load indicators. (101:20). Frey asked whether the defendant seemed nervous. Bigsby said he did not. (102:13-20).

Trooper Bigsby spoke to Haugaard about the shrink-wrap not looking right. Haugaard agreed that the configuration of the load on the floor did not look right. They noticed there was a set of boxes behind one of the larger stacks of boxes that was not shrink-wrapped. Instead, those boxes had different tape. Bigsby also noticed the floor of the trailer was flat and wooden. The composition of the floor was significant to Bigsby because this truck was owned by a one-truck produce company; it said "J and K Produce" (97:22-23) on the side of the truck and on the defendant's paperwork. In general, produce companies use trailers with vented ribs so the produce can drain into the floor rather than soak up boxes when they transport produce. (50:5-25). Bigsby assumed that if he was a one-truck company, then the defendant would be transporting produce. (98:1). The defendant, however, had eventually indicated that he was transporting toys. (99:9).

Investigator Lutter then came around to look at the boxes in the truck. Bigsby decided to get out of the truck, shut the door, and ask for consent to search the truck. He wanted to ask for consent to search because he had only asked whether he could look inside the vehicle and did not want to manipulate anything inside without permission. He wanted to keep the

-11-

contact a consensual encounter and give the defendant the opportunity to say no. (51:13-52:5).

After the door was shut, Bigsby asked the defendant if he would go back to the patrol unit. Defendant agreed to do so. When they were back inside the patrol car, Bigsby asked defendant for permission to search the truck, i.e., "[C]an I search your truck and trailer?" The defendant gave an affirmative response in English. Bigsby then proceeded with a written consent using a State Patrol consent to search form. (52:7-53:15; Exhibit 2).

According to Trooper Bigsby, with the exception of a couple of words, the defendant read the entire consent form out loud. Bigsby filled out the form and requested defendant's signature. The defendant signed the consent form, and Bigsby once again asked for verbal consent to search the trailer: "So, again, I can search your trailer?" (54:21-56:1). The defendant said something to the effect of "yeah, go ahead" or "yes." (56:3-4).

Bigsby asked the defendant if he wanted to remain seated or to stand outside. He said he wanted to stay inside the patrol vehicle. Bigsby exited the patrol car and opened the doors to the trailer. A short time later, the defendant got out of the patrol car and stood with Lutter and Haugaard, who had moved to the front of Bigsby's patrol car. (56:6-22).

Trooper Bigsby testified that he crawled inside the trailer, moving to the inside of the vehicle, and removed one of the load locks so he could get to the set of boxes that were a different side and were taped differently. Investigator Lutter also got up into the trailer. (56:24-57:13). Once he reached that area, Bigsby saw a wardrobe-type box with a perforated handle, which he pushed in. Through the perforation, Bigsby could see a package that was

-12-

wrapped in white contact paper with a small flowery pattern. (57:18-58:6). Based on his training and experience, Bigsby believed the box had a high probability of containing contraband. He did determine that the box contained marijuana. (58:190-16). He did not smell the marijuana when he pushed open the perforated handle.

After finding the box of marijuana, Bigsby directed Lutter and Haugaard to handcuff the defendant; Haugaard physically arrested the defendant. (59:21-25). Shortly thereafter, Bigsby cut into one of the packages and found it to contain marijuana. He summoned a supervisor, and Investigator Haugaard began taking pictures. According to Trooper Bigsby, 2,160 pounds of marijuana were seized from the defendant's truck.

The officers placed the defendant back in Bigsby's patrol vehicle, where Investigator Lutter attempted to Mirandize him and see if defendant would talk about what he had in his vehicle. Bigsby himself did not try to take any statement from the defendant.

Investigator Richard Lutter testified that he was called to assist Trooper Bigsby on February 19, 2007. Specifically, Bigsby asked him to go back to the Flying J to see if there were other vehicles or persons in the area that might be associated with the traffic stop he was conducting. (110:19-111:7). They wanted to see if there were vehicles associated with previous stops made by other officers and Bigsby involving vehicles with California plates. Lutter stated that he observed the vehicle that Trooper Frey stopped earlier that day. It was parked by the fuel pumps at the Flying J. Lutter considered making contact with that

individual, but the vehicle left prior to his making contact and shortly after Lutter received information from Frey that Frey had stopped the vehicle earlier. (111:19-112:1).

Lutter returned to the scene of Bigsby's traffic stop and saw Bigsby in his patrol vehicle with the defendant. He did not recall seeing the defendant try to leave the patrol car.

At some point, Bigsby received permission to look inside the defendant's trailer. At that time Lutter engaged in conversation or small talk with the defendant. (112:18-113:2). Lutter was in plainclothes and was not wearing any insignia indicating he was a State Patrol officer.

According to Lutter, Investigator Haugaard was the officer who actually handcuffed and arrested the defendant. (113:23-114:1). Lutter was standing inside the back of the trailer at that time and did not hear any comments that defendant may have made when he was arrested. (114:5-9). Later, Lutter did advise the defendant of his *Miranda* rights in English. Lutter testified he believed the defendant did not understand the advice of the right to remain silent; he had trouble understanding the English Lutter was reading to him. (114:24-115:4). At some point, Lutter stopped and asked the defendant to read a Spanish language form. After reading the Spanish language form, the defendant invoked his right to counsel. (115:5-10).

## LEGAL ANALYSIS

Defendant contends his vehicle was stopped without probable cause to believe its driver had committed any crime and, therefore, was stopped in violation of his Fourth

Amendment rights. "For purposes of constitutional analysis, a traffic stop is characterized as an investigative detention, rather than a custodial arrest." *United States v. Jones*, 269 F.3d 919, 924 (8th Cir. 2001) (citing *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984)); *United States v. Wheat*, 278 F.3d 722, 726 (8th Cir. 2001), *cert. denied*, 537 U.S. 850 (2002). As such, a traffic stop is governed by the principles of *Terry v. Ohio*, 392 U.S. 1 (1968). *Jones*, 269 F.3d at 924.

Under *Terry v. Ohio*, 392 U.S. at 21-22, a police officer may conduct an investigative stop if the officer has a reasonable suspicion that the person stopped is, or is about to be, engaged in criminal activity. *See also Delaware v. Prouse*, 440 U.S. 648, 663 (1979). Reasonable suspicion requires a particularized and objective basis for suspecting the person stopped of criminal activity, but the level of suspicion required for a *Terry* stop is less demanding than that for probable cause. *United States v. Gonzalez*, 220 F.3d 922, 925 (8th Cir. 2000) (internal quotations and citations omitted). "A reasonable suspicion may be justified even if there are innocent explanations for a defendant's behavior when the circumstances are considered in the totality." *United States v. Tuley*, 161 F.3d 513, 515 (8th Cir. 1999).

The question presented is whether, under the totality of the circumstances, Trooper Bigsby acted reasonably in stopping the defendant for a traffic violation. "It is well established that a traffic violation–however minor–creates probable cause to stop the driver of a vehicle." *United States v. Barahona*, 990 F.2d 412, 416 (8th Cir. 1993).

> Under Nebraska law,
>
> > All letters, numbers, printing, writing, and other identification marks upon such [license] plates and certificate shall be kept clear and distinct and free from grease, dust, or other blurring matter, so that they shall be plainly visible at all times during daylight and under artificial light in the nighttime.

Neb. Rev. Stat. § 60-399(2) (2005) (formerly Neb. Rev. Stat. § 60-324). Considering the condition of the defendant's license plate, as depicted in Exhibit 3, I find that Trooper Bigsby had an objectively reasonable basis for believing that the license plate display was not in conformity with Nebraska's traffic laws. *See, e.g., United States v. Flores-Sandoval*, 366 F.3d 961, 962 (8th Cir. 2004).

Having made a valid traffic stop, an officer may detain the occupants of the vehicle while completing "a number of routine but somewhat time-consuming tasks related to the traffic violation, such as computerized checks of the vehicle's registration and the driver's license and criminal history, and the writing up of a citation or warning." *United States v. $404,905.00 in United States Currency*, 182 F.3d 643, 647 (8th Cir. 1999), *cert. denied*, 528 U.S. 1161 (2000); *see also United States v. Barragan*, 379 F.3d 524, 528-29 (8th Cir. 2004). "During this process, the officer may ask the motorist routine questions such as his destination, the purpose of the trip, or whether the officer may search the vehicle, and he may act on whatever information is volunteered." *United States v. $404,905*, 182 F.3d at 643; *see also United States v. White*, 81 F.3d 775, 778 (8th Cir.), *cert. denied*, 519 U.S. 1011 (1996); *United States v. Ramos*, 42 F.3d 1160, 1163 (8th Cir. 1994), *cert. denied*, 514 U.S. 1134 (1995).

A *Terry* stop that is justified at its inception must also be sufficiently limited in scope and duration. *United States v. Ramires*, 307 F.3d 713 (8th Cir. 2002), *cert. denied*, 538 U.S. 1006 & 1007 (2003). The officers may conduct an investigation which is "'reasonably related in scope to the circumstances which justified the interference in the first place.'" *United States v. Jones*, 269 F.3d 919, 924 (8th Cir. 2001) (quoting *Terry*, 392 U.S. at 20). After the purpose of the *Terry* stop is completed, continued detention of the individuals is an unreasonable extension of the scope of the investigation unless something that occurred during the initial stop generated the necessary reasonable suspicion to justify further detention. *Id*. at 925.

In this case, I find credible the testimony of Trooper Bigsby that the defendant agreed to stay and converse with Bigsby, and the defendant was no longer "seized" within the meaning of the Fourth Amendment after Bigsby returned his documents. A reasonable person in defendant's position at the time he was asked for permission to search the trailer would "feel free to terminate the encounter and be on his way," and Trooper Bigsby did not somehow re-seize the defendant by asking him additional questions or by asking him for consent to search the trailer. *See United States v. Morgan*, 270 F.3d 625, 630 (8th Cir. 2001), *cert. denied*, 537 U.S. 849 (2002). Nothing in the record suggests that the trooper acted in such a way that a reasonable person would believe that he was not free to decline the request for further conversation or terminate the encounter altogether. *See id.* Thus, I find that the traffic stop was not unlawfully expanded, and that the subsequent contact between the

A *Terry* stop that is justified at its inception must also be sufficiently limited in scope and duration. *United States v. Ramires*, 307 F.3d 713 (8th Cir. 2002), *cert. denied*, 538 U.S. 1006 & 1007 (2003). The officers may conduct an investigation which is "'reasonably related in scope to the circumstances which justified the interference in the first place.'" *United States v. Jones*, 269 F.3d 919, 924 (8th Cir. 2001) (quoting *Terry*, 392 U.S. at 20). After the purpose of the *Terry* stop is completed, continued detention of the individuals is an unreasonable extension of the scope of the investigation unless something that occurred during the initial stop generated the necessary reasonable suspicion to justify further detention. *Id*. at 925.

In this case, I find credible the testimony of Trooper Bigsby that the defendant agreed to stay and converse with Bigsby, and the defendant was no longer "seized" within the meaning of the Fourth Amendment after Bigsby returned his documents. A reasonable person in defendant's position at the time he was asked for permission to search the trailer would "feel free to terminate the encounter and be on his way," and Trooper Bigsby did not somehow re-seize the defendant by asking him additional questions or by asking him for consent to search the trailer. *See United States v. Morgan*, 270 F.3d 625, 630 (8th Cir. 2001), *cert. denied*, 537 U.S. 849 (2002). Nothing in the record suggests that the trooper acted in such a way that a reasonable person would believe that he was not free to decline the request for further conversation or terminate the encounter altogether. *See id.* Thus, I find that the traffic stop was not unlawfully expanded, and that the subsequent contact between the

defendant and Trooper Bigsby was consensual. *See, e.g., United States v. White*, 81 F.3d at 779 (after defendant's license and registration were returned and the warning was issued, the encounter "became nothing more than a consensual encounter between a private citizen and a law enforcement officer"); *United States v. Santos-Garcia*, 313 F.3d 1073, 1078 (8th Cir. 2002) (defendant was no longer seized within the meaning of the Fourth Amendment after officer returned his identification and issued a warning ticket).

Finally, the court finds that the defendant voluntarily consented to the search of his vehicle. Police may search a vehicle, home or person without a warrant or probable cause if that person voluntarily consents to the search. *See, e.g., United States v. Bradley*, 234 F.3d 363, 366 (8th Cir. 2000); *United States v. Deanda*, 73 F.3d 825 (8th Cir. 1996). To determine whether such a consent was voluntary, the court must examine the totality of the circumstances, including the characteristics of the accused and the nature of the encounter. *See Bradley*, 234 F.3d at 366. The government has the burden of proving consent was voluntary. *United States v. Parris*, 17 F.3d 227, 229 (8th Cir.), *cert. denied*, 511 U.S. 1077 (1994); *United States v. Heath*, 58 F.3d 1271, 1275 (8th Cir.), *cert. denied*, 516 U.S. 892 (1995). "The prosecution need not prove that the individual was fully aware of his or her rights under the Fourth Amendment in order to establish a voluntary consent." *Heath*, 58 F.3d at 1275 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 235 (1973)). "Consent is voluntary 'if it was the product of an essentially free and unconstrained choice by its maker, rather than the product of duress or coercion, express or implied.'" *United States v. Fleck*, 413

F.3d 883 (8th Cir. 2005) (quoting *United States v. Chaidez*, 906 F.2d 377, 380 (8th Cir. 1990)).

In this instance, the videotape of the traffic stop corroborates Trooper Bigsby's testimony in all material respects. The record does not support the defendant's allegations that he did not understand what was being asked of him and that he did not voluntarily consent to the search of his vehicle.

## RECOMMENDATION

In summary, the court finds that Trooper Bigsby acted reasonably in detaining the defendant for a license plate display violation. After the purpose of the traffic stop was completed, the defendant voluntarily agreed to continue his conversation with Trooper Bigsby. The defendant voluntarily consented to the search of his vehicle. For these reasons,

**IT IS RECOMMENDED** that defendant's Motion to Suppress Evidence (#15) be denied.

Pursuant to NECrimR 57.3, a party may object to this Report and Recommendation by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten (10) business days after being served with the recommendation. The statement of objection shall specify those portions of the recommendation to which the party objects and the basis of the objection. The objecting party shall file contemporaneously with the statement of objection a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed de novo and a different disposition made.

**DATED August 7, 2007.**

        **BY THE COURT:**

        **s/ F.A. Gossett**
        **United States Magistrate Judge**